## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| ALYSSA KAHL, ANDRE BESSER, and BRANDI JOHNSON, individually and on behalf of all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.**: |
| Plaintiff, | ) ) ) ) |  |
| v. | ) ) ) |  |
| ALLINA HEALTH SYSTEM, | ) ) ) |  |
| Defendant. | ) ) ) ) ) |  |

## COMPLAINT

Plaintiffs, Alyssa Kahl, Andre Besser and Brandi Johnson ("Plaintiffs"), by and through their attorneys, on behalf of the Allina 401(k) Retirement Plan (the "401(k) Plan") and the Allina 403(b) Retirement Plan (the "403(b) Plan") (collectively, the 401(k) Plan and 403(b) Plan are referred to as the "Plans"),[1] themselves and all others similarly situated, states and alleges as follows:

## I.    INTRODUCTION

---

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants. The 403(b) plan is currently frozen to new contribution but retains assets. In particular, "in October 2010, new participant entry into the 403(b) Plan was frozen, and by January 1, 2011, all employee salary deferrals, employer matching contributions, and discretionary employer contributions were frozen." *See Larson et al. v. Allina Health System, et al.*, No. 17-cv-03835, at 3. "[E]ffective January 1, 2012, all eligible Allina employees became participants in the 401(k) Plan. Since that time, all deferral elections and employer contributions have been received within the 401(k) Plan." *Id.*

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciary, Allina Health System ("Allina" or the "Company" or "Defendant") for breaches of its fiduciary duties.

2.      The Plans are a defined contribution retirement plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plans. *See* Independent Auditor's Report attached to the 2023 Form 5500 for the 401(k) Plan ("2023 401(k) Plan Auditor's Report"), at 7; 2023 Form 5500 for the 403(b) Plan ("2023 403(b) Auditor's Report"), at 7.

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers." [2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

10.     Plaintiffs allege that during the putative Class Period, Defendant, as the "fiduciary" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11.     At all times during the Class Period, the Plans had over three billion dollars in assets under management. At the start of the Class Period in 2019, the 401(k) Plan had $2,259,801,772 and the 403(b) Plan had $995,623,904 in assets under management. *See* 2019 Form 5500s for the 401(k) Plan and 403(b) Plan, Schedule H at 2. Collectively, the Plans had over $3.2 billion in assets under management in 2019.

12.     By 2023, the 401(k) Plan had $3,186,058,657 and the 403(b) Plan had $950,961,651 in assets under management. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, Schedule H at 2. Collectively, the Plans had over $4.1 billion in assets under management in 2023.

13.     The Plans' assets under management qualifies them collectively as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[3] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plans.[4]

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

14.     As a jumbo plan, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

15.     The Plans are also large in terms of the number of its participants. At the beginning of the Class Period, the 401(k) Plan had 31,690 participants and the 403(b) Plan had 11,882 participants. *See* 2019 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. By 2023, the 401(k) Plan had 35,919 participants and the 403(b) Plan had 8,901 participants. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. Collectively, the Plans had 44,820 participants in 2023. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 90 defined contribution plans (401k, 401a, and 403b) in the country with between 30,000 and 39,999 participants with account balances. Additionally, there were only 54 retirement plans with between 40,000 and 49,999 participants.

16.     With regard to the Plans' investments, Defendant breached its fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment contract ("GIC") in the Plans with lower crediting rate when compared to available similar or identical investments with higher crediting rates, both within the 401(k) Plan and outside of the Plans. The crediting rate is the guaranteed rate of return for the investment fund.

17.     Specifically, Defendant allowed substantial assets in the Plans to be invested in a general account GIC with Principal Life Insurance Company (the "Principal GIC"), that provided significantly lower rates of return than comparable stable value funds that Defendant could have made available to Plan participants, including two GICs in the 401(k) Plan with Brighthouse Life Insurance Company and Lincoln National Life Insurance Company.

5

18.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

19.    Principal benefited significantly from participants in the Plans investing in the Principal GIC. A prudent fiduciary who adequately monitored the Plans' investments and placed the interests of participants in the Plans above all would have recognized that the Principal GIC was benefitting Principal at the expense of the participants in the Plans. The investments in the Principal GIC were held and invested by Principal, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plans' participants). The crediting rates that Principal provided to the Plans were and are so low that Principal reaped a windfall on the spread.

20.    During the putative Class Period, Defendant, as the "fiduciary" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance.

21.    Defendant's mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Its actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

22.    Based on this conduct, Plaintiffs assert claims against Defendant for breach of the fiduciary duty of prudence (Count I) and failure to monitor fiduciaries (Count II).

II.    **JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

24.     This Court has personal jurisdiction over Defendant because the Plans are administered in this District meaning Allina transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

25.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Allina does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

III.    **PARTIES**

        **Plaintiffs**

26.     Plaintiff, Alyssa Kahl ("Kahl"), resides in Zimmerman, Minnesota. During her employment, Plaintiff Kahl participated in the 401(k) Plan. Ms. Kahl invested in the Principal GIC in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the Principal GIC.

27.     Plaintiff, Andre Besser ("Besser"), resides in New Hampton, Iowa. During his employment, Plaintiff Besser participated in the 401(k) Plan. Mr. Besser invested in the Principal GIC in the 401(k) Plan and suffered injury to his Plan account due to the significant underperformance of the Principal GIC.

28.     Plaintiff, Brandi Johnson ("Johnson"), resides in Sarasota, Florida. During her employment, Plaintiff Johnson participated in the 401(k) Plan. Ms. Johnson invested in the Principal GIC in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the Principal GIC.

29.     Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendant's unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duties as described herein.

30.     Further, each of the Plaintiffs have standing to bring this action on behalf of the Plans even if they only participated in one of the Plans because "[a]n individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Fallick v. Nationwide Mutual Ins. Co.,* 162 F.3d 410, 422 (6th Cir. 1998); *see also Dann v. Lincoln Natl. Corp.*, *et al.*, 708 F.Supp.2d 481, 487 (E.D. Pa. 2010); *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003) ("Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class."). As the Eighth Circuit has recognized, "a plaintiff may be able to assert causes of action which are based on conduct that harmed him, but which sweep more broadly than the injury he personally suffered." *Braden*, 588 F.3d at 592.

31.     Here, the Plans were sponsored by the Company and administered in the same manner, including having Fidelity serve as the recordkeeper for both of the Plans and having the Principal GIC as an investment option.

32.    Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendant**

33.    Allina Health System is the sponsor of the Plans and a named fiduciary of the Plans with a principal place of business at 2925 Chicago Avenue, Minneapolis, Minnesota. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 1. Allina is a nonprofit health system that provides services for individuals, families and communities throughout Minnesota and western Wisconsin.[5]

34.    The Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). *See* Allina 401(k) Retirement Savings Plan [As Restated Effective January 1, 2014] ("Plan Document" or "Plan Doc."), at 69. ("The Company is the 'administrator' of the Plan for purposes of ERISA.").

35.     Although the Plan has in place the Allina Health System Investment Committee of the Board of Directors ("Committee"), Allina has assumed responsibility for the fiduciary breaches alleged in this action.

36.    Pursuant to the Plan Document, the Company indemnifies the Committee against any liability arising from services provided by the Committee. *See* Plan Doc. at 71 ("[T]he Company and the Participating Employers jointly and severally agree to defend, indemnify and hold harmless, to the extent permitted by law, each director, officer, and employee of the Company and the Participating Employers against any and all liabilities, losses, costs, or expenses (including legal fees) of whatsoever kind and nature which may be imposed on, incurred by, or asserted

---

[5] *See* https://www.allinahealth.org/about-us, last accessed on April 3, 2025.

against such person at any time, whether imposed under ERISA or otherwise and whether civil, criminal, administrative or investigative, by reason of such person's services as a fiduciary or administrator in connection with the Plan, or by reason of acting in any other capacity in connection with the Plan."); *see also* Investment Committee of the Allina Health Board of Directors Charter, at 1 ("**Once again, neither the Investment Committee nor the Board of Directors has any authority or responsibility over the Retirement Plans.**") (emphasis in original).

37.     According to Plan documents the Committee served as a Named Fiduciary of the Plans within the meaning of Section 402(a)(2) of ERISA. The Committee's powers and duties included, among other things, "determine[] the [Plans'] valuation policies utilizing information provided by the investment advisors, custodian, and insurance company." Independent Auditor's Report to the Committee, attached to 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 9; *see also* Allina Retirement Savings Plan Summary Plan Description January 1, 2025, at 14 ("A number of investment options are available to you, including; The Core Investment Options selected by the Allina Health Retirement Committee.").

38.     The Committee and its members are not identified as a defendant in this action given Allina's indemnity of the Committee.

39.     During the Class Period, Allina exercised fiduciary functions through the Committee by exercising discretionary authority over management or disposition of plan assets.

40.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## IV.   CLASS ACTION ALLEGATIONS[6]

41.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendant and any fiduciary of the Plans and their immediate family members, who were participants in or beneficiaries of the Allina 401(k) Retirement Plan and/or the Allina 403(b) Retirement Plan at any time between November 22, 2019 to the date of judgment (the "Class Period").[7]

42.     The members of the Class are so numerous that joinder of all members is impractical. The 2023 401(k) Form 5500 lists 35,919 "participants with account balances as of the end of the plan year." 2023 401(k) Form 5500, at 2. The 2023 403(b) Form 5500 lists 8,901 "participants with account balances as of the end of the plan year." 2023 403(b) Form 5500, at 2.

43.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendant's mismanagement of the Plans. Defendant treated Plaintiffs consistently with other Class members, and managed the Plans as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiff reserves his right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

44.   There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.   Whether Defendant is/was a fiduciary of the Plan;

B.   Whether Defendant breached its fiduciary duties of prudence by engaging in the conduct described herein;

C.   Whether the Defendant failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

D.   The proper form of equitable and injunctive relief; and

E.   The proper measure of monetary relief.

45.   Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

46.   This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLANS

### A.     The 401(k) Plan

48.     The 401(k) Plan is a "defined contribution plan established on January 1, 1989, for the employees of Allina Health System (Employer) and its predecessor organizations." 2023 401(k) Auditor's Report, at 7; *see also* Allina Qualified Savings Plans Statement of Investment Objectives and Policies ("IOP"), at 1-2 ("The Plans are Defined Contribution Plans and are intended to allow employees to partner with Allina Health in accumulating a portion of the necessary savings needed for a secure retirement.").

49.     The 401(k) Plan "includes an automatic enrollment feature whereby any participant that does not make an election is automatically enrolled to contribute 4% of their compensation." 2023 401(k) Auditor's Report, at 7; see also Plan Doc. at 19-20 ("[E]ach Participant who becomes an Automatic Enrollment Participant on or after October 1, 2011, will be deemed to have made an election under subsection (a) to have his or her current earnings reduced by four percent (4%) as of the 45th day following the date he or she becomes an Automatic Enrollment Participant.")

50.     Included in the 401(k) Plan's available funds were "traditional fully benefit-responsive guaranteed investment contracts with Principal Financial Group (Principal),

Brighthouse Life Insurance Company (Brighthouse), and Lincoln National Life Insurance Company (Lincoln), collectively referred to as 'insurance companies'."

51.    At the end of 2019, $250,662,230 in 401(k) Plan assets were invested in the Principal GIC, while only $156,081 and $234,526 were invested in the Brighthouse GIC and Lincoln GIC, respectively. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2019, attached to 2019 401(k) Form 5500, at 14.

52.    By the end of 2023, over $290 million in 401(k) Plan assets were invested in the Principal GIC, while only $126,202 and $153,393 were invested the Brighthouse GIC and Lincoln GIC, respectively. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 401(k) Form 5500, at 17.

53.    The chart below demonstrates the amount of 401(k) Plan assets invested in the GICs during the Class Period.

| Plan Year | Plan Assets in Principal GIC | Plan Assets in Brighthouse GIC | Plan Assets in Lincoln GIC |
|---|---|---|---|
| 2019 | $250,662,230 | $156,081 | $234,526 |
| 2020 | $284,719,844 | $145,845 | $236,459 |
| 2021 | $318,718,178 | $137,902 | $219,210 |
| 2022 | $306,122,944 | $128,023 | $149,425 |
| 2023 | $290,721,695 | $126,202 | $153,393 |

### B.    The 403(b) Plan

54.    The 403(b) Plan is a "defined contribution plan established on January 1, 1989, for the employees of Allina Health System (Employer) and its predecessor organizations."

55.    Included in the 403(b) Plan's available funds was "a traditional fully benefit-responsive guaranteed investment contracts with Principal Financial Group (Principal)."

14

56.     At the end of 2019, $129,356,307 in 403(b) Plan assets were invested in the Principal GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2019, attached to 2019 403(b) Form 5500, at 12.

57.     By the end of 2023, over $89 million in 403(b) Plan assets were invested in the Principal GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 403(b) Form 5500, at 14.

58.     The chart below demonstrates the amount of 403(b) Plan assets invested in the Principal GIC during the Class Period.

| Plan Year | Plan Assets in Principal GIC |
|---|---|
| 2019 | $129,356,307 |
| 2020 | $131,821,851 |
| 2021 | $131,259,517 |
| 2022 | $117,054,362 |
| 2023 | $97,706,899 |

## VI.   THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANT FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.   ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

59.     As described in the "Parties" section above, Defendant was a fiduciary of the Plan.

60.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

15

61.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

62.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

63.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

64.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

65.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

16

66. The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

67. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

68. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

69. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

70. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendant's decision-making process with respect to the Plans, including Defendant's processes (and execution of such) for selecting, monitoring, and removing the Plans' investments because this information is solely within the possession of Defendant prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

71.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

72.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

73.     Defendant's breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Principal GIC in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

**B.      Defendant Breached Its Fiduciary Duties by Causing the Plans to Offer the Principal GIC**

**1.      Overview of GICs**

74.     For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

75.     GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

18

76.     There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

77.     Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates.

78.     And General account products, such as the Principal GIC, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs.  Consequently, general account GICs offer the highest rates.

79.     Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

### 2.     The Plans Inclusion of Principal GIC

80.     At all relevant times, Defendant maintained the authority to exercise control over the Plans' investments, including the Plans' Principal GIC.

81.     Principal establishes the crediting rates for its GIC with the Plans. Principal "is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan. The crediting rate is based on a formula established by the contract issuer but may not be

less than 0%. The crediting rate is reviewed on a quarterly basis for resetting." 401(k) Auditor's Report, at 12; 403(b) Auditor's Report, at 11.

82.    Principal earns a "spread" equal to the difference between the crediting rate and the returns Principal earns on the funds in its general accounts.

### 3.    There are Many GICs in the Marketplace with Competitive Crediting Rates

83.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

84.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendant.

85.    The Principal GIC in the Plans had underwhelming crediting rates when compared against GICs provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[9] |
|------|-----------|---------------------|-------------|-------------------|----------------|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |

---

[9] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

20

| | | | | | |
|---|---|---|---|---|---|
| | 401(a) Profit Sharing Plan | | | | |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Allina 401(k) Plan** | **31,689** | **$2,259,801,772** | **Principal GIC** | **2.06%** |
| | **Allina 403(b) Plan** | **11,882** | **$995,623,904** | **Principal GIC** | **2.14%** |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |

| | | | | | |
|---|---|---|---|---|---|
| | **Allina 401(k) Plan** | **32,203** | **$2,690,046,457** | **Principal GIC** | **2.10%** |
| | **Allina 403(b) Plan** | **11,099** | **$1,078,426,855** | **Principal GIC** | **2.18%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Allina 401(k) Plan** | **33,143** | **$3,101,666,838** | **Principal GIC** | **1.82%** |
| | **Allina 403(b) Plan** | **10,351** | **$1,118,110,142** | **Principal GIC** | **1.99%** |

| | | | | | |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Allina 401(k) Plan** | **34,554** | **$2,678,277,538** | **Principal GIC** | **1.86%** |
| | **Allina 403(b) Plan** | **9,604** | **$846,612,268** | **Principal GIC** | **1.92%** |

| | | | | | |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Allina 401(k) Plan** | **35,919** | **$3,186,058,657** | **Principal GIC** | **2.83%** |
| | **Allina 403(b) Plan** | **8,901** | **$950,961,651** | **Principal GIC** | **3.01%** |

86.     Throughout the Class Period, the Principal GIC in the 401(k) Plan underperformed the comparator funds by an average of over 45% and the Principal GIC in the 403(b) Plan underperformed the comparator funds by an average of almost 43%, as demonstrated in the table below.

24

| Year | Principal GIC Rate of Return in 401(k) Plan | Principal GIC Rate of Return in 403(b) Plan | Comparator Average Rate of Return | Principal GIC Percentage of Underperformance in 401(k) Plan | Principal GIC Percentage of Underperformance in 403(b) Plan |
|---|---|---|---|---|---|
| 2019 | 2.06% | 2.14% | 3.94% | 47.72% | 45.65% |
| 2020 | 2.10% | 2.18% | 3.75% | 44.00% | 41.97% |
| 2021 | 1.82% | 1.99% | 4.19% | 56.56% | 52.45% |
| 2022 | 1.86% | 1.92% | 4.06% | 54.19% | 52.76% |
| 2023 | 2.83% | 3.01% | 3.85% | 26.49% | 21.89% |
| Average Underperformance during Class Period | | | | 45.07% | 45.07% |

87.     In short, because the Plans held between $3.1 billion and $4.2 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

**4.      The Alternate GICs in the 401(k) Plan (Brighthouse GIC and Lincoln GIC) Outperformed the Principal GIC**

88.     Even more compelling that the Principal GIC was an imprudent investment option in the Plans is the fact that the two alternative GICs in the 401(k) Plan had substantially higher crediting rates than the Principal GIC, as demonstrated in the chart below.

| Plan Year | Principal GIC Crediting Rates | Brighthouse GIC Crediting Rates | Lincoln GIC Crediting Rates |
|---|---|---|---|
| 2019 | 2.06% | 3.44% | 3.73% |
| 2020 | 2.10% | 3.72% | 3.45% |
| 2021 | 1.82% | 3.41% | 3.50% |
| 2022 | 1.86% | 3.69% | 4.07% |
| 2023 | 2.83% | 3.46% | 3.40% |

89.     However, and despite the disparity in crediting rates, assets of the 401(k) Plan invested in the Principal GIC were substantially higher than assets in the Brighthouse GIC and Lincoln GIC.

| Plan Year | Assets in Principal GIC | Assets in Brighthouse GIC | Assets in Lincoln GIC |
|---|---|---|---|
| 2019 | $250,662,230 | $156,081 | $234,526 |
| 2020 | $284,719,844 | $145,845 | $236,459 |
| 2021 | $318,718,178 | $137,902 | $219,210 |
| 2022 | $306,122,944 | $128,023 | $149,425 |
| 2023 | $290,721,695 | $126,202 | $153,393 |

90.     A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from Principal and/or by submitting requests for proposals to Principal and other providers of stable value investments.

91.     By selecting the Principal GIC with underperforming crediting rates, Defendant provided participants with an investment option that failed to maximize the value of their investments.

92.     With the massive amount of assets under management in the Principal GIC, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[10]

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**

---

[10] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

**(against the Company)**

93.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

94.     At all relevant times, the Committee was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

95.     As indicated *supra*, throughout the Class Period and continuing to the present, the Company indemnifies the Committee against any liability arising from services provided by the Committee.

96.     As fiduciary of the Plans, the Committee was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

97.     The Committee breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Committee did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Committee selected and retained investment options in the Plans despite poor performance in relation to other comparable investments.

98.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Committee complied with its fiduciary obligations, the Plans would not have

27

suffered these losses, and Plans' participants would have had more money available to them for their retirement.

99.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), and the Company indemnification agreement, the Company is liable to restore to the Plans all losses caused by the Committee's breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

100.    The Company knowingly participated in each breach of the Committee, knowing that such acts were a breach, enabled the Committee to commit breaches by failing to lawfully discharge such the Company's own duties, and knew of the breaches by the Committee and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, Company is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company)**

101.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

102.    Allina had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee had critical responsibilities as fiduciaries of the Plans.

103.    In light of this authority, the Company had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt

28

and effective action to protect the Plans in the event that the Committee was not fulfilling those duties.

104. The Company also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Company. The Company breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee's imprudent actions and omissions.

105. As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars in losses. Had the Company complied with its fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

106. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Company is liable to restore to the Plans all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D.      An Order compelling the Defendant to make good to the Plans all losses to the Plans resulting from Defendant's breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendant made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E.      An order requiring the Company to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendant from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: July 2, 2025                                  Respectfully submitted,

                                                     /s/ Mark Dooley
                                                     Mark Dooley, Esquire
                                                     NEATON & PUKLICH, PLLP
                                                     7975 Stone Creek Drive, Ste. 120
                                                     Chanhassen, MN  55317
                                                     Email: Mdooley@neatonpuklich.com
                                                     Tel.: (952) 258-8444
                                                     Fax:    (952) 258-9988


                                                     Mark K. Gyandoh, Esquire
                                                     James A. Maro, Esquire
                                                     (*Pro Hac Vice* to be requested)
                                                     **CAPOZZI ADLER, P.C.**
                                                     312 Old Lancaster Road
                                                     Merion Station, PA 19066
                                                     Email: markg@capozziadler.com
                                                             jamesm@capozziadler.com
                                                     Tel.: (610) 890-0200
                                                     Fax: (717) 232-3080

                                                     *Counsel for Plaintiff and the Putative Class*

31